IN UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| **GERTRUDE ANITA BROADWAY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **CIVIL ACTION** |
| | ) | **NO.  2:10-cv-02898-JPM-tmp** |
| **FEDERAL EXPRESS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

The Defendant's Motion for Summary Judgment is premised upon the assertion

that a manager with a manifest intent discriminated against an African American

employee for any reason, including race, past complaints, pending corrective action

plans, etc. may seize upon a company's otherwise legitimate RIF plan in order to remove

the employee from his work place.  Defendant's decision to engage in an otherwise

legitimate RIF allowed Vice President Sean Healy an opportunity to remove Plaintiff,

one of the numerous African American engineers who complained that he was an

unlawful discriminator, from the Federal Express workplace. Healy did so by attaching a

series of labels to the work of three engineers in his division of 50 to 60 employees

within the engineering job family.  The least value label was attached by Healy to the

work of two African American engineers, Plaintiff and Antonio Pittman.  He compared

their work, he said, and determined Pittman's work to be of greater value.  Thus, Plaintiff

was "Reduced in Force" and demoted to a lower grade in another city.  The label

"critical" was attached by Healy to the work of one Caucasian engineer, Rachel Riley. He thus justified his failure to compare Riley with either Pittman or Plaintiff even though her alleged "critical work" was also being performed by at least three other engineers in Plaintiff's unit.  Both Pittman and Riley were retained in Memphis. Neither had complained that Healy had treated them differently, while Plaintiff had complained and was covered by a pending corrective action plan imposed upon Healy.  If Riley was indispensable to the AOD function, the three other employees who performed the task would not also have been doing it as well.

Healy's decision to label the work as he did allowed him to elevate the work of Riley who had been hired in at a grade level 27, the same as Plaintiff, above the work of Plaintiff who had many years of experience. See Plaintiff's Exhibit 1, para. 11, 13.  In doing so, Healy knew that the company required him to undertake such action with priority regard for seniority.  The company allowed Healy such latitude although he was under two corrective action plans from African American engineers regarding their complaints of discrimination against him.  At least one of them stated that Healy engaged in a pattern of discrimination against African American engineers. Odigie Exhibit 10.

The company furthered the discrimination against Plaintiff when Federal Express' "legal" department specifically denied Plaintiff the privilege of an interview before Robert Bennett in his shop for a posted position during the time she was waiting to be reassigned.  The Defendant, however, allowed the privilege of an interview before Bennett to young white male also affected by the RIF and then hired him although he did not meet the facial qualifications for the job according to Bennett.

With respect to Defendant's argument that the work which Plaintiff performed was low in value and diminishing, Defendant presents shifting reasons as to where the work went upon Plaintiff's RIF, i.e., 'it went 'to training, it did not go to training and it is now being performed by others in Jones' unit on reassignment.' But the actual number of engineers in Plaintiff's former unit remained the same –8-- because as Plaintiff was being RIFed, a Caucasian engineer was being brought into her unit.  The shifting reasons entwined with the utter unlikeness that any decisionmaker would assign its most important work to a trainee, makes Defendant's explanation unworthy of credibility and casts doubt upon the legitimacy of the asserted reason for its adverse employment decision.

Plaintiff establishes Healy's racial animus by substantial evidence and by the company's otherwise unexplained behavior in filling a vacancy with a Caucasian affected employee where it did not afford Plaintiff an interview despite timely application and superior qualifications.

Plaintiff has met Defendant's Motion and Facts with contrary evidence, has established a prima facie case and is entitled to move forward to trial

## II.   ARGUMENT

A.  Summary Judgment is not appropriate in this case as a matter of law.

The Federal Rules authorize motions for Summary Judgment.  The parties generally agree that a Motion for Summary Judgment may be filed where the movant claims the absence of "any material fact in dispute" and that the moving party is entitled to judgment as a matter of law.  Rule 56 (c) FRCP.  The motion must be decided upon the papers without regard to witness credibility. *Anderson v. Liberty Lobby*, 477 U.S. 242,

249.   Plaintiff submits that summary judgment is not appropriate based upon the facts and arguments set forth below.

> B.   The Defendant's argument that Plaintiff cannot establish that a similarly situated person not in the protected class received the position in issue is disputed.

Defendant argues that Plaintiff can not demonstrate that she was replaced with someone outside her protected class pointing to Rachel Riley, an engineering specialist, now grade 24.  Defendant argues that Ms. Riley is not a "similarly situated" comparator, although both she and plaintiff worked under the same manager, because Ms. Riley had a different job title, job code and performed a very different function than plaintiff. Def. Brief, p. 5.   Defendant argues that the AOD audit function, one of several engineering assignments given to Riley, was so important that "any disruption" could have serious negative consequences to Federal Express."  This fact is disputed in several ways.

First, both jobs were in the same job family. Plaintiff Exhibit 3, Jones, Dep. 25, 32.  Second, both jobs had the same title and grade, 27, when Defendant hired Riley in 2008.  The code number is irrelevant.  After Plaintiff was given notice of RIF, she filed an internal EEO the company's Human Resources department.   Riley's grade was reduced from 27 to 24 [with the note that she should have been initially placed as grade 22].  Her title changed from "Senior Engineering Specialist" to "Engineering Specialist," an entry level position.  Her work assignment was left in place in the job family with Plaintiff. See Plaintiff's Exhibits 27 and 3, supra.

Second, each project engineer and engineering specialist, by whatever title, did much the same work.  The grade levels of the employee reflected differences in

responsibility, tenure, training and education.  Generally, less qualified entry level employees were assigned lower grade levels and work which reflected their grades and all the members of the group essentially assisted each other and performed many of the same work functions.  See Plaintiff's Exhibits 13-16.

Third, Riley was not hired to perform AOD audits exclusively.  She was hired per a general job description as were other project engineers to be members of the engineering family rather than for a specific assignment.  See Plaintiff's Exhibit 45. Fourth, there were at least three other project engineering specialists, a project engineer and one chief engineer who were already performing the suddenly, grossly important AOD audit function in engineering. See Plaintiff's Exhibits 13-16.  In addition, the audits which Riley earlier performed while supervising hourly workers were materially different from those performed by the college trained engineering department members, of whom Ms. Riley was not one, or by trained auditors in the company's auditing department. Plaintiff Exhibit 6, p. 22.

In short, Defendant extols the worth of Riley's AOD audit assignment both as unique to her qualifications and as "critical" to the work of the company in order to justify its displacement of Plaintiff whose objective qualifications dwarfed Riley's.  It is hardly likely that an entry level employee new to the engineering field, would be assigned that department's most critical work.  If the work was so critical to the company's financial structure or basic operations, it reasonably was already ongoing through other project engineering specialists.  As Plaintiff's facts demonstrate, the AOD audit function was "decreasing" when Teresa Brignole left the department. Plaintiff Exhibit 16, p.3.  See *Hunter v. City of Copperhill, TN*, Case No. 1:09CV238, USDC, ED,

Tenn. at Chattanooga (November 29, 2011) quoting *Dennis v White Way Cleaners*, L.P. 119 SW 3rd 688, 697 (Tenn. Ct. of Appeals, 2003) citing *Barnes v GenCorp, Inc*. 896 F. 2d. 1457 (6th Cir. 1990) " an employer cannot avoid liability by changing the job title or by making minor changes to a job indicative of an attempt to avoid liability." Slip Opinion at page 8.

Fifth, the RIF standards were not followed in that Defendant did not make a comparison regarding job family, tenure and other qualifications. Accordingly, Riley was an engineer who like Plaintiff took various assignments.  That made her similarly situated to plaintiff.  See *Ercegovich v. Goodyear Tire & Rubber Co*., 154 F.3d. 344 (6th Cir. 1998) citing *Mitchell v Toledo Hospital*, 964 F. 2d. 577 (6th Cir. 1992) for the proposition that "plaintiff was simply required to prove that all of the relevant aspects of [her] employment were 'nearly identical' to those of the non minorities employment situations" … a contrary approach would undermine the remedial purpose of the anti-discrimination statutes."  It also brought into play the RIF criterion of seniority.

C.  Plaintiff's evidence meets the heightened standard regarding RIF as set forth in *Mynatt v. Lockheed Martin*, 271 Fed Appx, 470 (6th Cir 2008)

The facts in this case are materially different from those in *Mynatt*.  Here, the factual context for the RIF of plaintiff is misrepresented.  The two employees, Plaintiff and Riley are in the same job family.  See Plaintiff's Exhibit 27 and Exhibit 3, Jones Dep. p.25, 32.  In *Mynatt*, the employer compared two similarly identified employees qualifications and job duties separately who were not necessarily in the same job family. Here, Healy, did not do that.  He looked at the "functions" of the jobs within the department for the purpose of determining which work could be displaced rather than the

6

qualifications of the individuals performing those specific functions who could be displaced.  He did not consider seniority as represented to be the most important criterion. Plaintiff's Exhibit 37.  Moreover, he was grossly mistaken on what employees did. See Plaintiff's Exhibit 2, Healy Dep. p. 39-40.

Further, in *Mynatt*, the employer had an understandable RIF policy; here the employer's representatives - Healy vs. Bennett – have a dispute about what RIF considerations to apply.  Here, VP Robert Bennett who supervised the process declared that the process <u>required,</u> upon identification of less critical <u>positions</u>, that there to be a second and third step, the purpose of which was to insure that senior employees (like Plaintiff) would not be supplanted by junior, less qualified employees (like Riley).  See Plaintiff's Exhibit 3a, Bennett Declaration, para. 7.  See also *Welborn v. Shelby Co*. Gov., #10-2528-STA-cgc (WD Tenn, November 28, 2011)  at p. 17; *Guiger v. Tower Auto*, 579 F. 3d. 614, 622 (6th Cir. 2009)

 Healy did not proceed to step two nor step three because, if he is to be believed, he understood he was not to consider individuals.  Neither employee had a "position" other than project engineering specialist or senior engineering specialist; each had assignments which could be changed daily. Accordingly, because Riley did not have a specific position other than as engineering specialist, grade 24, she was not guaranteed insulation from a RIF as the three step comparison would apply to her as well.

Healy did not follow steps of the process as outlined by Bennett.   Had he done so, similar results would have occurred as in the case of Andrew Foster, who worked under VP Donald Colvin. Colvin first determined the less critical engineering work in his division; then he went to step two and three described by Bennett in order to ensure that

senior employees were not supplanted by junior, less qualified employees. See Plaintiff's
Exhibits 35 and Plaintiff Exhibit 1, para. 16.  See also Plaintiff Exhibit 3a, p.2.  Contrary
to the Healy decision where Plaintiff was displaced rather than Rachel Riley, Foster, with
less tenure, was demoted and the more senior project engineer was retained.  Both were
Caucasian.

> D.  The Defendant's Proffered Reason that it reduced Plaintiff's job status for
> legitimate business reasons is pretextual.

The Defendant has argued that Plaintiff was removed from her engineering job in
2009 because her work had the lowest value in Healy's division.  Thus, it was necessary
to remove her as an engineer for economic reasons.  Plaintiff submits that the reason
proffered 1) has no basis in fact; 2) did not actually motivate the Defendant's decision; or
3) was insufficient to warrant the Defendant's challenged conduct."  *Dewes v. A.A. Dick
Co.*, 231 F.3d 1016, 1021, (6th Cir. 2000).  At this stage, pretext is a "common sense
inquiry" where Plaintiff need only to "produce evidence from which the jury could
reasonably doubt the employer's explanation."  *Chen v Dow Chemical Co.*, 580 F. 3d,
394, 400.

Vice President Healy made the adverse RIF decision of Plaintiff.  Healy's defense
is summarized as follows. He was aware of the fact that the company wanted to reduce its
staff by 10% for economic reasons.  His information and instructions came from Vice
President Bob Bennett.  Neither Healy nor Bennett read the plan. Plaintiff Exhibit 2,
Healy Dep. p. 21 and Plaintiff Exhibit 3, Bennett Dep. p.80-84.  Healy determined that
the would affect 17 people including 5 with engineering titles.  There were about 50
persons with engineering titles in his division.  He understood that before deciding upon

8

whom to "affect", he was to first independently assess the work of his division and then determine what work was of least importance to the success of his division's objectives. He was then to determine who performed the work.  Then he was to determine "seniority."  Rather than follow that process, Healy made a judgment about employees whose work he determined to be "critical," not a term in the RIF plan. As he understood his tasks with these objectives, he proceeded to identify individuals to "affect" and decided to "affect" upon two African American engineers in his division by demoting them from their grade 27 engineering jobs, Plaintiff and Melba Hassanen.  He decided to allow two Caucasian engineers, one a manager, to transfer.  One went to North Carolina; the other went to Chicago. Neither was demoted!

Healy's mental judgment guided his decision making in removing and demoting two African American, grade 27 engineers. His judgment was subjective. Healy did not compare the worth of the work of all engineers in Jones' unit or in his division. (Hassannen was in a different manager's unit. Her manager reported to Healy, however.) He neither knew their work or their performance reviews in order to be informed but Healy necessarily knew more about Plaintiff's work (Plaintiff's Proposed Material Fact No. 25, 26 and 34) because he had issues with her which emanated from an internal IEEO that resulted in her placement into Jones' unit, and because Jones discussed Plaintiff with Healy in late 2008 while the company's RIF planning process was under way. (Plaintiff's Proposed Material Fact No. 9)  He knew far less about the work of noncomplaining Caucasian engineers.  Accordingly, he was not in position to, nor did he, make a comparative evaluation of the work being performed by engineers throughout his

department.  That means he compared an African American against another African American engineer in Jones' unit and removed one of them.

Healy says that he also knew about the employment circumstances of Rachel Riley whom he authorized Jones to hire upon consultation with Kirsten King, managing director.  He says that King provided him the "rationale" for hiring Riley, i.e., the importance of Riley's past AOD audit work in a non-engineering unit.  Accordingly, he did not affect her because he, King and Jones, thought her work to be "critical," although Jones had just recently described the AOD work as decreasing in importance.  Healy, therefore, considered three people in Jones' unit; two in a black on black comparison, and Riley whom he excused because she performed the unit's most important work, the AOD audits.  It is to be noted that Riley was hired in January, 2008 at least six (6) months prior to King, who had no engineering experience, being made managing director. A jury could find Healy's excuse on this point plainly false.

At the time he was mentally exploring his RIF options, in March and April, 2009, Healy was under at least one corrective action plan regarding violation of policies and procedures as a consequence of complaints of two other African American engineers under his general supervision, Mike Odigie and Dianne Watkins-Jackson.  Odigie's complaints reflected that Healy tended to treat African American engineers and their work in a devalued way and, at least by inference, Healy tended to treat Caucasian engineers and their work as of high value.  Healy often worked one on one with them on their projects and shared credit for their success.  A jury could also find that Healy was prejudiced against African American engineers and that his treatment of Plaintiff was part of a pattern and practice of adverse actions directed towards black engineers.

The attachment of a label to define work as "critical" or as "low value" is subjective unless it is first defined and then has measurement criteria.  The Booz plan and company explanations only prioritized seniority within job families addressed, those terms have been imposed upon the plan. Plaintiff's Exhibits 30 and 37. Those terms allowed Healy occasion to use them and another opportunity to discriminate.

Plaintiff submits that the facts strongly suggest a finding of pretext on the part of Healy which was ratified by the company.    The after the fact treatment which Plaintiff experienced is probative of that pretext: a) when Healy's removed Plaintiff from Jones' unit, he assigned another Caucasian engineer to it , Bruce Houston; and b) while Plaintiff was seeking other work in the company, the company refused to provide her an interview for the job, Business Strategist, grade 29. Plaintiff's Exhibit 3, Bennett Dep. 104-121. Bennett was the selecting official but the decision to deny Plaintiff an interview was made by Ms. Harris in the legal department.  Legal granted the equally affected Caucasian an interview and the job as well.  The only reason given by Bennett for this employment decision was that it was out of his hands.  *Barnes*, supra., 896 F. 2d. 1457,1464 citing *Farnco Construction Co. v. Waters*, 438 U.S. 567, 577 (1978).

Finally, a reasonable jury could find it incomprehensible that in a RIF situation a trainee, entry level engineer, Riley, who did not meet minimum job requirements, would be given the division's most important work and then in a RIF situation be favored for retention over a far greater qualified person, with great engineering tenure within a context where the RIF plan itself in writing and other company documents requires adherence to seniority of affected employees.

The Defendant's proffered reason for it decision to RIF Plaintiff rather than Riley has no basis in fact.  Riley's qualifications were minimal for the lowest level job of  the department.  Her experiences were not unique.  Other persons in the department also performed the AOD task.  Plaintiff and she were in the same job family.  Seniority was therefore the important phenomenon in a nondiscriminatory, legitimate RIF situation it was entirely disregarded by Healy.

The defendant's proffered reason for its RIF decision of Plaintiff was not the motivating or real reason for the decision or for that matter to deny her an opportunity to interview for a job in Bennett's shop that would have allowed her to stay in Memphis. *Barnes v GenCorp Inc*., 896 F. 3d 1457, 1475 (6th Cir. 1990) This denial contributes to the suspicion that racial factors surrounded Plaintiff's employment circumstances.

The Defendant's reason for RIFing Plaintiff is both false and frivolous when placed in context.  Accordingly, the proffered reason did not motivate Defendant's adverse action toward her.  The value of Plaintiff's work was never in issue but had it been it could have been determined upon a more comprehensive comparison than the superfluous one between her and Antonio Pittman.  That comparison meant that an African American employee from Jones's unit had to go, if indeed anyone had to go! Standing alone, the defendant's proffered reason was not sufficient to discharge Plaintiff even in a heightened standard RIF context.  Important employment decisions are reasonably not made on a basis where satisfactory employees are discharged on a whim which would be the case here, and a new employee selected to replace her, were Plaintiff's race was not a factor.

Therefore, Riley is an appropriate comparator because both were managed by Jones; b) both were assigned level 27 engineering tasks by Jones; and c) both worked in the same unit; d) both worked with other engineers on projects assigned by Jones.  Under these circumstances, plaintiff and Riley are similarly situated, notwithstanding the Circuit's heightened standard of scrutiny test. *Ercegovch v Goodyear Tire & Rubber Co*. 154 F. 3d. 353 (6th Cir 1998)

E.  Defendant's decision to demote Plaintiff was racial

The company decision to RIF Plaintiff was racially motivated as demonstrated below:

1.  The company's division managed by Vice President Sean Healy demoted two project engineering specialists, grade 27, both African American – Plaintiff and Melba Hassanen.  It did not demote any of the approximately fifty white engineers who were in Healy's division. Although there were at least 3 others were identified. Plaintiff Exhibit 1, Broadway Declaration. para. 17.  Instead, Defendant transferred John Pongetti to North Carolina as a grade 27 project Engineering Specialist and Richard Wooten to Chicago as an engineering manager. Plaintiff's Exhibit 2, Healy Dep. 18, 70.

2.  Healy compared Plaintiff's work only to that of Antonio Pittman. That is an indication, as stated by Plaintiff and Odigie in their declarations, that Healy tended to devalue their work.

3.  Healy did not know the work assignments of the other engineers who were mostly Caucasian.

4.  Healy judged as critical work that had been described as "decreasing" by Jones in his evaluation of Brignole when the work was performed by multiple project engineers the year earlier.

5.  Healy did not compare the work of a relatively new hire who was Caucasian to the work of Plaintiff.  Healy did not take care to ensure that senior staff were treated fairly.  Finally, much of the work now assigned to Riley is the work which Plaintiff performed.

6.  Healy had a previous complaint of racial treatment by Plaintiff. It can also be said that Healy and his subordinate managers' hiring and treatment of Riley was indicative of the favor Healy extended to Caucasian employees.  Healy overlooked Riley's patently deficient qualifications and hired her as Senior Engineering Specialist, grade 27 in 2008 when she only qualified for an entry level job, grade 22. Moreover, Healy's rationale that Riley was exceedingly qualified to perform a unique function is highly suspect when a) the importance of the function was "decreasing" and b) the function was already being performed by three senior unit engineers.  These facts are probative on the issue of Healy's intent to favor Caucasian engineers over African American engineers in making decisions to remove parties from the company as engineers regarding the RIF.  Another racial factor is the company's refusal to consider Plaintiff for the position of Business Strategist, grade 29.  The position was awarded to a Caucasian person also affected by the RIF with explanation.

Moreover, Healy's explanations to the EEOC regarding Plaintiff's race discrimination claim demonstrate a tendency to misrepresent facts when race is involved in his decision making.  He told the EEOC, for example, that plaintiff's job duties were

14

*transferred* to the Training department when in fact they weren't.  See Plaintiff's Exhibits

28 and 29.  His assertion is contradicted, however, by Defendants brief herein at page 4:

> "all of Plaintiff's job duties were reassigned to existing employees,
> including fellow African American Tony Pittman."

This argument discredits the company's position that Plaintiff's work was excess or low-
valued in comparison to Riley's.

## CONCLUSION

Plaintiff has presented a prima facie case of employment discrimination due to

race announced in *McDonald Douglas v. Green*, 411 U.S. 792 (1973).  Her evidence is

sufficient to meet the "heightened" standards articulated by the Sixth Circuit in many

cases.  1. Plaintiff Broadway is an African American citizen who is a member of

a protected class.  2) Plaintiff was qualified for the work she was performing.  3)

Plaintiff was subjected to an adverse employment action, i.e., she was removed from her

job assignment as an engineer, grade 27 and reassigned to a lower graded 26 position in

another city outside engineering. 4) She has presented evidence which shows that she was

singled out for impermissible reasons.  *Guiger v. Tower Auto*, 579 F.3d. 614,622 (6th Cir.

2009); *Stovall v. Settle, et al*. No. 10-2388-STA-dkv, (W.D. Tenn., Nov. 18, 2011)

The Defendant has set forth a reason for its action which it claims to be

legitimate and non-discriminary.  It also controverts Plaintiff's evidence.

Plaintiff has presented in its totality evidence from which the Court (jury) may

conclude that the Defendant's explanation is not worthy of credence and/or is pretextual.

Plaintiff has presented further evidence which shows that more likely than not

race was a factor in the Defendant's decision to take adverse action against Plaintiff.

Because Plaintiff has both presented her own Statement of Material Undisputed

facts and has controverted in detail Defendant's Statement of Material Undisputed Facts,

there are clear and genuine issues of material fact that exist regarding Plaintiff's race

claims such that the Court should deny Defendant's Motion for Summary Judgment

WHEREFORE, Plaintiff prays that the Defendant's Motion for Summary

Judgment should respectfully be denied.

<div style="margin-left:40%">

Respectfully submitted,

/s/John W. Walker
JOHN W. WALKER, P.A.
1723 Broadway
Little Rock, Arkansas 72206
501-374-3758 (telephone)
501-374-4187 (facsimile)
Email:  johnwalkeratty@aol.com

</div>

<div style="text-align:center">

**CERTIFICATE OF SERVICE**

</div>

I hereby certify that on this 16th day of January, 2012, a true and correct copy of the foregoing was filed and served electronically with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following:

<div style="margin-left:25%">

John W. Campbell (BPR 16017)
Senior Counsel
Federal Express Corp.
3620 Hacks Cross Road,
Building B, 2nd Floor
Memphis, Tennessee 38125
Telephone: (901) 434-8403
Facsimile:   (901) 434-9279
Email:  jwcampbell@fedex.com

</div>

<div style="margin-left:40%">

/s/ John W. Walker_____

</div>

<div style="text-align:center">16</div>